·CASE 9—ACTION BY CARRIE TAYLOR AGAINST PHOENIX NATIONAL BANK
TO RECOVER A DEPOSIT.—MARCH 14.

# Phoenix National Bank v. Taylor.

APPEAL FROM FAYETTE CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANT APPEALS. REVERSED.

BANKS AND BANKING—FORGERY OF CHECK—SIGNING BY AUTHORITY OF
DEPOSITOR—INSTRUCTIONS TO JURY—EX PARTE AFFIDAVITS AS EVI-
DENCE—COMPARISON OF HANDWRITING—ADMISSIBILITY OF WRIT-
INGS SIGNED BY MARK.

Held:   1. In an action against a bank to recover a deposit in which
plaintiff by reply denied that a check for the amount sued for,
which defendant had paid, was signed by her, or by her au-
thority, it was error to instruct the jury that, in order to find
for defendant, it must believe that the check was signed by
plaintiff, but the court should, as requested by defendant, have
instructed the jury to find for defendant if it believed that the
check was signed by plaintiff, "or by another for her and with
her consent, or by her authority."

2  If plaintiff received the proceeds of the check with knowledge of
the fact that the money had been paid by defendant thereon, or
the money was deposited to plaintiff's credit in another bank,
and drawn out by her or by her authority, she was not en-
titled to recover, and the court should have so instructed the
jury as requested by defendant.

3 *Ex parte* affidavits filed upon a motion by plaintiff for a subpoena *duces tecum* were not admissible as evidence for plaintiff before the jury, though the facts stated therein may have been competent evidence if properly proved.

4. Under Civ. Code Prac., section 604, subsection 2, so providing, writings are not admissible for comparison with a writing the genuineness of which is in dispute, unless such writings were executed before any controversy arose as to the geneuineness of the writing in dispute.

5. Writings which plaintiff had signed by making her mark were not admissible as evidence for her to show that she could not write, or for the purpose of comparing them with a disputed writing to which her name was signed without her mark.

WEBB.& FARRELL AND MAT WALTON, FOR APPELLANTS.

The question in this case is, whether a check for $450 purporting to have been signed by Carrie Taylor on the Phoenix National Bank, and which the bank paid was in fact signed by her or by another for her or with her consent or authority. She claims that said check was a forgery.

The errors complained of in this case are:

1. The error of the court in improperly instructing the jury and in failing to properly instruct the jury.

2. The error of the court in admitting improper evidence.

3. The error of the court in overruling the motion for a new trial.

The appellant asked the two following instructions:

1. "If the jury believe from the evidence that the check for $450 dated January 4, 1899 drawn upon the Phoenix National Bank, signed Carrie Taylor, and afterwards paid by defendant, was in fact signed by the plaintiff Carrie Taylor, or by another for her and with her consent or by her authority, they should find for the defendant."

2. "If the jury believe from the evidence that the check described in the above instruction was paid by the defendant, and the plaintiff with knowledge thereof received the proceeds of said check, or the same was deposited to plaintiff's credit at the Planters' Bank of Americus, Georgia, and the same was drawn out of said bank by her, or by her order, or authority, they should find for the defendant, even if the jury believe from the evidence that the plaintiff did not actually sign said check or authorize another to sign same for her."

The court refused to give the above instructions and gave the following:

"The jury should find for the plaintiff unless they believe

from the evidence that the check for the sum of $450 dated January 4, 1899 drawn in favor of the Planters' Bank or the Phoenix National Bank to which the name of Carrie Taylor was signed was in fact signed by said Taylor; and if the jury believe from the evidence that said Carrie Taylor did sign her name to said check, the jury should find for the defendant."

After the jury retired, they returned into court and asked if they could consider whether the check was signed by some one other than Carrie Taylor, by her authority or with her con-sent? In response to this question and over the objection of the appellant, the court gave the following additional instruction:

"In response to a question propounded to the court by the jury, the court instructs the jury, that there is no evidence in this case conducing to show that the name of Carrie Taylor was subscribed to the check heretofore mentioned in the instructions, by any person other than Carrie Taylor, therefore if the jury believe that the name of Carrie Taylor was signed to said check by her they should find for the defendant. But if they believe that it was signed by some other person they should find for the plaintiff."

The incompetent evidence complained of was the admission of evidence to prove that another check for $605 given on said bank by Carrie Taylor was lost, by which it was claimed that said check had been suppressed by the bank so as to avoid comparison of the signature thereto to the one in controversy, and also the court permitted another writing to be introduced to which Carrie Taylor's name was signed by mark, as evidence that her name was not signed by her to the check in controversy.

After the verdict and judgment was rendered the appellant filed the affidavit of its president, D. F. Franzee, showing that a witness named Wearren had been discovered who would testify that the appellee, Taylor had told him that she had given the check in question to Dr. Burchett, and that these facts had been learned since the trial. The affidavit of Wearren was also filed.

### AUTHORITIES CITED.

Conadeau v. Am. Accident Co., 95 Ky., 281; Com. v. Tate, 89 Ky., 606; Buford v. L. & N. R. R. Co., 82 Ky., 287; L. & N. R. R. Co. v. McCombs, 21 R., 1237.

FALCONER & FALCONER, ATTORNEYS FOR APPELLEE.
BRECKINRIDGE & SHELBY, OF COUNSEL.

We claim that the evidence complained of by appellant was competent with the explanation made to the jury by the court as to the $605 check. Also that the evidence introduced by ap-

pellee of a writing signed by her by mark was competent to show she could not write her name.

Under the pleadings the burden was on the appellant to show the genuineness of the check in controversy, and under this issue we submit that the instructions given by the court were proper and those offered by appellee were properly refused.

The newly discovered evidence, as it appears in the affidavits filed in support of appellant's motion for a new trial, does not meet the requirements of this court, as it is merely a verbal admission of appellee—the weakest of all evidence.

### AUTHORITIES CITED.

Jones on Evidence, secs. 168, 297, 898; Strong v. Brewer, 17 Ala., 706; Fogg v. Dennis, 3 Hump. Tenn., 47; Thompson v. Davette, 59 Ga., 472; Mercer v. Mercer, 87 Ky., 71 Allen v. Perry, 6 Bush, 85; Vaughan v. Hann 6 B. Mon., 338.

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Appellee, Carrie Taylor, was a depositor of the Phoenix National Bank of Lexington, and had therein to her credit during the year 1898 $1,055. This controversy involves the genuineness of a check for $450 asserted by the bank to have been executed by appellee January 4, 1899, payable to the Planters' Bank, and signed "Carrie Taylor," and which had been drawn on and paid by appellant. Appellee sued the bank for the sum of $450, claimed to be the balance remaining to her credit, and which it had refused to pay on her demand. She repudiated the check to the Planters' Bank, claiming that it was not her act. It was shown that appellee was a lewd woman, and had become apparently infatuated with one Burchitt, who was a soldier in the United States army, encamped at Lexington for a period during the year 1898. Upon the transfer of the command to which he belonged to the South in the winter of 1898, she followed him there. He was for a while located at Americus, Ga., where she joined him, and where their relations were of that intimate nature that they passed as

Phoenix National Bank v. Taylor.

husband and wife. His command having been ordered to
Mantanzas, Cuba, she returned to Lexington. It is claimed
by the bank that while she was at Americus she executed
the check in question. The Planters' Bank was located in
Americus, Ga. Burchitt testified that this check was given
to him by appellee, with her name signed to it; that, while
he did not see her sign it, yet it was written upon a printed
blank check in use by appellant bank, and that she took it
from a book of such checks that she had in her possession
there, and that he assumed that she had signed it; that he
filled in the body of the check in her presence, and at her di-
rection, and deposited the money at the Planters' Bank to
her credit in her name. Subsequently she drew a check on the
Planters' Bank, payable to J. G. Burchitt,—at least such
check was presented with her name signed to it,—which
was honored by the bank. Appellee denied the whole of the
transaction above named, denied that she signed the check,
and denied that she authorized any one else to sign it for
her. The first trial of the case resulted in a disagreement
of the jury. This trial resulted in a verdict for appellee,
nine of the jury concurring.

The court gave the following instruction: "The jury
should find for the plaintiff, unless they believe from the
evidence that the check for the sum of four hundred and
fifty dollars, dated January 4, 1899, drawn in favor of the
Planters' Bank on the Phoenix National Bank, to which
check the name of Carrie Taylor was signed, was in fact
signed by said Carrie Taylor; and if the jury believe from
the evidence that said Carrie Taylor did sign her name to
said check, the jury should find for the defendant." Ap-
pellant moved the court to give the jury the following in-
structions, which was overruled: (1) If the jury believe

from the evidence that the check for $450, dated January 4, 1899, drawn upon the Phoenix National Bank, signed "Carrie Taylor," and afterwards paid by the defendant, was in fact signed by the plaintiff, Carrie Taylor, or by another for her and with her consent, or by her authority, they should find for the defendant. (2) If the jury believe from the evidence that the check described in the above instruction was paid by the defendant, and the plaintiff, with knowledge thereof, received the proceeds of said check, or the same was deposited to the plaintiff's credit at the Planters' Bank of Americus, Georgia, and the same was drawn out of said bank by her, or by her order or authority, they should find for the defendant, even if the jury believe from the evidence that the plaintiff did not actually sign said check, or authorize another to sign the same for her."

We are of opinion that the instruction given by the court was too limited, in view of the plea and circumstances shown in this case. The plea was a justified payment by the bank. The circumstances and evidence on behalf of the bank were that the depositor, Carrie Taylor, delivered to John G. Burchitt a check with her name signed to it. It is true it was also testified by Burchitt that he was acquainted with her handwriting, and that the signature was hers. She having denied her signature, the jury may have believed, and under all the facts and circumstances in this case might have been warranted in believing, that, although she did not sign her name to the check, she authorized another to sign her name to it. Furthermore, if she did not sign the check, or if she did not authorize it signed, yet, if she accepted the proceeds which had been deposited in the Planters' Bank to her credit, and drew her check against the same, she thereby ratified all that had preceded that act; and this would have been a justification of the

original signature of her name to the check. Therefore
instructions 1 and 2 offered by appellant should have been
given to the jury.

As the case must be returned for a new trial, it becomes
necessary to pass upon certain objections to the evidence.
It appears that there were but two checks drawn against
the deposit of $1,055. One was the check in controversy;
the other was a check for the balance of $605, presented by
appellee, and paid by the bank. She admits that she signed
her name to this last check. Before this trial appellee
procured a subpoena *dues tecum* against the officers of
the bank to produce this last named check, ostensibly for the
purpose of comparison of the handwriting in the signatures
of the two checks. In order to obtain the subpoena, she
filed her affidavit, setting forth in legal phraseology the ex-
ecution of the last-named check, and certain occurrences
which she alleged transpired on the occasion when she and
her counsel had visited the bank and examined it. This
was all shown evidently for the purpose of informing the
court that the check was in fact in the custody of the offi-
cers of the defendant bank. In response to the subpoena,
the president of the bank filed his affidavit, in which he ex-
plained the absence of this check—that it had been lost or
misplaced without fault of the bank, or that it had been
delivered to appellee; in other words, it was an explanation
to the court why the bank was unable to comply with this
order to produce the paper as directed. Over the objec-
tion of appellant both of these affidavits were permitted to
be read to the jury. We are unable to perceive wherein
they were relevant to the issue submitted. The fact that
she had signed the last check and had called for its produc-
tion was properly admitted to the jury. Then it was also
permissible for the bank to explain to the jury by the tes-

timony of witnesses, if it saw proper to do so, why it had not produced and could not produce the check. These matters, however, should not be proven by *ex parte* affidavits, not allowing opportunity for cross-examination, but letting it appear that the witnesses had knowledge and made statements therefrom, which, in response to questions properly put, they may not have been justified in making in the way of competent evidence. We are of opinion that the court erred in admitting the affidavits. They were merely for the use of the court, unless it was offered to show that a witness had made a different statement in them to that testified to by him on the trial.

Appellee claims that prior to January 4, 1899, she could not read and could not write, and could not sign her name. This she testified on the trial. It was, of course, a relevant fact to be proved by her, or by any other having knowledge of it. Before the trial she filed in the record six chattel mortgages: One dated July 13, 1897, to the Rhodes-Burford Furniture Company, for $54, putting in pledge certain articles of furniture. It appears to be signed, "Carrie X Taylor," (her mark) attested by W. R. Baker and A. Price. Another similar mortgage, executed July 13, 1897, to secure $153, putting in pledge certain articles of furniture to A. F. Wheeler & Co., of Lexington. This was signed "Carrie X Taylor," (her mark). Witnesses, R. F. Thompson and J. H. Harris. Another, dated July 29, 1899, to the Rhodes-Burford Furniture Company, to secure $43.15 upon certain articles of furniture, which was signed "Carrie Taylor." Another, dated August 1, 1898, to the Rhodes-Burford Furniture Company, to secure $6, pledging certain articles of furniture.

This was signed "Carrie X Taylor." Witnesses, H. J. Smith and A. W. Kelley. Another, dated 29th of June, 1899, to the Rhodes-Burford Furniture Company, for $8, securing certain articles of furniture, signed, "Carrie X Taylor," with two witnesses. Another dated April 24, 1900, to A. F. Wheeler & Co., signed "Carrie Taylor." These papers are said to have been introduced upon notice under section 604, Civil Code Prac.: "That in any action, prosecution or proceeding, civil or criminal, which is now pending or may be commenced hereafter, upon a dispute as to the genuineness of the handwriting of a person, other handwriting of such person, though not in the case for any other purpose, may be introduced for the purpose of comparison by witnesses with the writing in dispute; and such writings, and the testimony of witnesses respecting them, may be submitted to the court or jury as evidence concerning the genuineness of the writing in dispute: Provided, that— (1) The genuineness of such writings shall be proved, to the satisfaction of the judge, by other than opinion evidence. (2) It must be proved, to the satisfaction of the judge, that they were written before any controversy arose as to the genuineness of the writing in dispute, and that no fraud was practiced in their selection. (3) A party proposing to introduce such writings must give reasonable notice of his intention to the opposite party or his attorney, with reasonable opportunity to examine them before commencement of the trial. (4) The judge may limit the number of such writings. (5) An error of the judge shall be subject to revision and correction in the same manner as if the error had been committed by the court." It will be observed that subsection 2 of this section provides that the handwriting

offered for comparison must have been written before any
controversy arose as to the genuineness of the writing in
dispute. The check for $605 is alleged to have been paid
to appellee on December 8, 1899, and some time previous
to that she had denied the genuineness of the $450 check.
Therefore writings executed by her subsequent to the time
when she had denied the genuineness of the disputed writ-
ing are not relevant for purposes of comparison.

A somewhat unusual question is presented as to appel-
lee's claim of right to use other mortgages signed by her
mark, her name being written by another, for purposes of
comparison with the disputed handwriting under this sec-
tion of the Code. If it should be said that these mortgages
signed in this manner were used as evidence of the fact
that appellee could not write her name, we are of opinion
that they were not relevant for that purpose, because they
do not tend to prove that fact. They prove merely that
she did not sign her name to those particular papers, not
that she could not write it. The fact that she could not
write her name is, of course, a relevant one in this case,
as we have said, and might be proved by relevant and com-
petent evidence. One who can write his name may choose
to sign by his mark, or may choose to have another sign
his name for him. In either event the legal effect of his
signature as to its binding him would be the same, ex-
cept in certain known exceptions; as, for example, the case
of a surety, whose name was signed by another, and who
did not make his mark. It is for the jury to decide from
all the facts and testimony in evidence whether appellee
could write. There was evidence for appellant, however,
that appellee could write her name. In fact, she admits
that she, at the time of the trial, could write her name, and
at the time of the presenting of the last check upon the

bank could and did sign her name. She claims that she learned to write her name after she returned from Americus, Ga., and that she was taught to do so by copying from envelopes addressed to her.

It is to be noted that it is the contention of appellant and of its witnesses that appellee signed the name "Carrie Taylor" to the check in controversy. One of the methods of proving the genuineness of a questioned signature is by comparing its handwriting with other and known and admitted handwritings of the disputant. In Strong's Ex'rs v. Brewer, 17 Ala., 706, the question was whether an obligation was signed by Isaac Brewer by making his mark in the shape of a cross, his name being written at length by some other person. To prove the execution of this obligation, the plaintiff introduced his son as a witness, who testified to the handwriting of his mother, and also stated that he knew the mark of his father, Isaac Brewer, and the mark attached to the foot of the instrument he believed to be his father's mark. The defendant objected to this mode of proving the instrument on the ground that a mark, differing from an ordinary signature, could not be proved in the manner proposed. But the objection was overruled by the court. Said the Alabama supreme court, by Chief Justice Dargan: "The general rule, which admits of proof of the handwriting of a party, is founded on the reason that in every person's manner of writing there is a peculiar prevailing character, which distinguishes it from the handwriting of every other person, and therefore that one who knows the handwriting of the party is competent to testify to it." The court further said: "The degree of weight to be attached to it depends not only upon the character of the witness, but also upon the opportunity he has had of acquiring a knowledge of the party's handwriting. It may be more difficult to ac-

quire a knowledge of a simple mark, by which an illiterate man executes a deed, than the knowledge of the handwriting of one who can write his name in full, but we can not perceive why it may not be done. In some instances the peculiarity may be as strong as that which marks the characters of one who can write, and in other instances not, perhaps, so great; yet in all, we apprehend, would be found something distinct and peculiar, which would. enable one who had frequently seen the party make his mark to know it." In Thompson v. Davitte, 59 Ga., 472, the attesting witness to a will could not write his name, but made his mark. The question arose whether he was competent to identify the paper as the one attested by him. The court instructed the jury "that the mark made by a witness in attesting a will need not have any peculiarity about it, but any mark is sufficient if the witness, when called to testify, can swear to the mark." The court said: "The Code pronounces a mark sufficient on the sole condition that the witness shall be able to swear to it. This is all the heraldry of the matter. Nothing like a system of crests or bearings is contemplated, not even any special hook or claw on which the mind can hang recognition. As best it can, the memory may lay hold, and hold on, and the conscience may swear to it. A court can not declare any peculiarity necessary where the witness needs none. It is not improbable that those who make marks for default of skill in making letters have an aptitude of their own in distinguishing marks that to ordinary eyes look alike." These are the cases cited by appellee to sustain the action of the court below in admitting the mortgages to the jury for purposes of comparing the signatures to them with the signature to the check in controversy. We are of opinion that the cases, while sound, do not support the contention made by appellee. It will be

observed that these cases justify the admission of testimony of witnesses that they can see a similarity between the marks used by the signer of the respective papers that are signed by mark only, and that such similarity is strong enough to support the opinion of the deponent that they were made by the same person. It is probable that the same basis of reasoning would allow the introduction of such papers for comparison by the jury under the provision of our Code, supra. But where the disputed handwriting does not purport to be by another than the one whose name is signed, a "mark" not being used in the signature, we are of opinion it is not competent to offer it for comparison with a paper signed merely with a cross or other mark, claimed to have been previously made by the signer, with his name written in full by some other person. We are unable to perceive where any legitimate help or light could be thrown upon the matter in dispute by the comparing of the characteristics of the two handwritings. It is that peculiar characteristic attaching to the mechanical formation of letters by which they may be identified as having been made by one particular person that justifies admitting other handwriting of the same party for comparison to prove that the disputed one was probably executed by the same person who wrote the genuine ones. We are therefore of the opinion that none of the signatures to the mortgages in question (unless it be the one of June, 1899) should have been submitted to the jury.

The judgment is reversed, and cause remanded for proceedings consistent herewith.